WILLIAM CLARK, APPELLANT, vs. THOMAS N. GAUTIER, IN BEHALF OF DICK, A PERSON OF COLOR, APPELLEE.

The writ of *habeas corpus* is not the proper method of trying the right of a negro to freedom.

This case was decided at Marianna.
Appeal from Jackson Circuit Court.

On the petition of Thomas N. Gautier in behalf of Dick, alleging him to be free and unlawfully detained in slavery and custody, a writ of *habeas corpus* was issued against William Clark to show cause why he detained the said Dick.

It appears by the record that Dick is a mulatto man, and that he has been held in servitude from early infancy. The witnesses for the petitioner deposed that his mother was a white woman, and that he was sold for a small price until he was twenty-one years old. This, however, was controverted by witnesses examined by defendant.

The Court below decided that Dick was entitled to his freedom, and ordered that he be set at liberty, from which the defendant appealed.

*Milton & Milton* and *Yonge & McClellan* for appellant.

*A. H. Bush* for appellee.

BALTZELL, C. J., delivered the opinion of the Court.

We have given this case the anxious deliberation and reflection due alike to its importance and the gravity of the interests involved, regretting that the shortness of the time allowed will not admit a more careful development of the legal principles and questions connected with its proper solution.

The controversy arises from an application by Thomas N. Gautier, stating that Dick is a free man and detained in slavery and custody, without lawful authority, by Wm. Clark. This allegation is denied, and it is insisted that he is a slave.

Whilst listening with pleasure to the impassioned appeals of the counsel of petitioner, depicting in lively colors the claims and rights of his client, and, on the other side,

the no less forcible and animated reply of his opponent, enforcing with great power the rights of the defendant claiming to be the owner, we have not been unmindful of the fact that to us is not assigned the high position of weighing considerations of abstract right and propriety. These pertain to the sovereignty lodged in another department of government—to the legislature. Our office is the more humble, the deeply responsible one of ascertaining, with whatever ability we may possess, the law as it is, and of determining and declaring the rights of the parties before us, without yielding either to the suggestions of policy or to the still more imposing ones of humanity. The relation which the African race bears and has borne to the white man from the earliest period of history is set forth in language clear and perspicuous and demonstrable beyond doubt in the able opinion delivered by the Judges of the Supreme Court of the United States in the celebrated case of Dred Scott vs. Sanford, 19 Howard, 393. It would be a vain effort to try to add to what is there so well expressed. It is sufficient to refer to these opinions to show that whatever rights the negro or his descendants, if free, may have, are accorded to him, not by right, but permission and grant of the State in which he is. People from other parts of the globe, through the comtiy of nations, have a recognized position by the common voice of the civilized world which Africans have not. Condemned to servitude, subjected indeed to the dominion of other people from time immemorial, they have been, as they yet continue to be, chattels, subjects of trade and commerce. The mark of color at once fixes upon them the *status* of inferiority and degradation, and by whatever fact, in legal contemplation they are regarded as slaves, so that, in case of contest, the burthen of proof is thrown upon them of establishing their state of freedom. Nor is the rule estab-

lished that the rights of free negroes depend entirely upon municipal regulations.   In several of the States they have been permitted to bring actions of trespass to test their right to freedom—as in Kentucky, Tennessee and North Carolina; and in our own State one case exists in which a like decision was had, though the question as to the remedy seems to have been overlooked or not regarded.— 1 Haywood, 422; 2 Mon., 467; 6 Yerger; Sibley vs. Maria, 2 Florida, 560.

In other States, there would seem to be provisions particularly applicable to the subject, though we speak cautiously on this point, not having access to a full library. The writ of *habeas corpus* has been allowed them without dissent, so far as we can discover, not to try the right in case of real contest, but in cases of clear and unquestionable claim.   It has been universally refused and deemed inadequate in cases where there has been such contest and where the effect of a decision by the Court would be to deprive the party in possession asserting a claim of the right of trial by jury.   There has not been an adjudication by the Courts of a Southern State cited to us, nor have we been able to find such, wherein a question of real contest as to the right of freedom on the part of the person claimed as a slave the remedy of *habeas corpus* has been considered the appropriate one to determine this question.   At the North, we well know that the right of a slave to jury trial has been earnestly insisted upon in all cases, even those presenting the clearest and most irrefragible evidence as to him.   Here, the effect of an allowance of the writ to the extent claimed would be a denial, by Southern law and adjudications of Southern Courts, to the white man of the very privilege claimed for the negro by Northern philanthropy.

The controversy before us, as already indicated, is upon

the claim of the negro man Dick to his freedom. Testimony was taken, both orally and by depositions, to establish and controvert it. It is uncontroverted that Dick is a man of color, a mulatto; that he has been held in servitude from early infancy, a period of near twenty-five years, this possession being uninterrupted; that he was purchased for a price, though a small one. The witnesses on one side depose that his mother was a white woman; that he was sold only until he was twenty-one years, &c., whilst this is controverted by others. The Court below determined the case in favor of petitioner, being of opinion that the evidence preponderated in his favor. Whether, under the circumstances of the case, this may be rightfully done through the remedy adopted, the writ of *habeas corpus*, is the question for our adjudication. There being, fortunately for us, decisions made by Courts holding the same relation with ourselves to this delicate subject, assented to and having the sanction and approbation of the entire Southern judicial mind and people, has relieved us of the necessity of investigation to ascertain the entire verity of the conclusions to which they have arrived.

The case of the State vs. Frazier, jailer of Richmond county, decided in 1831, in the State of Georgia, was an application of this kind. The Court say :. " Can it, under this writ, enquire into and adjudge the right to freedom claimed by the petitioner in opposition to the claim of property in her as a slave by Philpot? These are the questions distinctly presented to the Court for their determination, and, though grave and important, they seem simple enough to be answered without much hesitation. The writ of *habeas corpus* is intended for the protection of the personal liberty of freemen, and never was designed or used to try any right of property. The Court of King's Bench, in the case of Penelope Smith, reported in 2

Strange, 982, refused to enquire into and determine the right of guardianship, declaring that the father, who had sued out the writ and sought to have possession of his son, had other remedy, &c. Here the Court is called upon, not to determine the right of guardianship, but the right to. the perpetual and involuntary service of Winney, or whether she be or be not the slave of Philpot. The guardian of Winney has other remedy." The Court said they could not trench on the constitutional rights of another to render to her summarily what may be and perhaps is justice. She was discharged.—Dudley's Reps., 45.

In South Carolina, the writ *de homine replegiando* was resorted to, which the Court refused to entertain, alleging its disuse in England as having been superseded by the writ of *habeas corpus*, a much more efficient remedy. In this case, they declared that the true remedy of the petitioners claiming to be free persons of color was the statutory provisions made for their case, (Huger vs. Barnwell, 5 Richardson, 277,) and not through permission of the common law.

The case of De Lacy vs. Antine, decided by the Court of Appeals of Virginia, is still more in point. "In considering this case, said Tucker, J., I concede, as ever, that, under our law, the *habeas corpus* is not the proper method of trying the right to freedom. The act of 1795 has prescribed the remedy which the negro must pursue. Anterior to this act the *habeas corpus* and *homine replegiando* were resorted to by slaves asserting a right to freedom, but, as these remedies proved vexatious and unsafe, a new proceeding was presented by the act already cited, the *homine replegiando* was repealed and the *habeas corpus* was considered as no longer appropriate. It is observable, however, that there is no provision in the act which denies the *habeas corpus* to a person illegally confined in custody,

although he be a free person of color, nor can I believe it was ever designed to exclude any free man whatever from the benefit of this great salutary writ. When, indeed, on the face of the petition it appears that the case presents a litigated question as to the right of a negro to his freedom, the writ should be refused as inappropriate to the case. When this does not so appear, but carries out in the return and is sustained by the proofs, the party should be remanded or sent to a Justice of the Peace to make his complaint according to law. To suppose that a free negro, in possession of regular free papers, may be falsely imprisoned, at the pleasure of any individual, without redress, is indeed to attribute a gross and lamentable omission to the law. A free negro, as well as a free white man, must be entitled to the benefit of the *habeas corpus* act both according to its language, which is broad and general, and, still more, according to its spirit, which is yet more liberal and beneficial. If it were otherwise, that wretched class would be altogether without protection from the grossest outrages, and their personal liberty would be an unsubstantial shadow. In such cases, therefore, the Court must exercise a sound discretion, discharging the party when there seems to be no real litigation as to the right to freedom and remitting him to his suit in *forma pauperis* where there is." Brooke, Judge, dissenting, says, it is admitted that as slaves they are not entitled to the writ of *habeas corpus*, and that the question of property cannot be tried on the writ. In a forum having jurisdiction of the question of slavery under our statutes, the color of the party, showing that he is of the African race, is *prima facie* evidence that he is a slave and puts the onus on him to prove that he is free. This is one of the hardships of his condition. On the contrary, the foundation of the right to the writ of *habeas corpus* is that he

is a free man, and the word person in the act of *habeas corpus* implies that he is free and not one whose title to freedom can be questioned anywhere. The provision that he is to make affidavit and give bond before the writ can be obtained, implies the same. The provision in the English Magna Charter, (4 Co., 45,) that no free man shall be taken or imprisoned, &c., is the foundation of the writ of *habeas corpus.*—7 Leigh's Reps., 443, 451.

In Thornton vs. Dimas, decided by the High Court of Errors and Appeals of Mississippi, the same view was taken of this subject. The C. J. says: "In all civil proceedings, negroes are regarded by our laws as property, and the owner or claimant cannot be deprived of his right or claims except by a verdict of the jury. The 48th section of the act in relation to slaves provides the mode by which a negro who claims to be free shall establish his freedom, and it is the only remedy which he can pursue. Negroes, although persons for some purposes, are generally regarded as property and excepted out of the general legislation in regard to persons unless specially included. The color is *prima facie* evidence of liability to servitude."—5 S. & M., 617–18.

Such are the views taken by intelligent Southern Courts on this interesting question, and though there may be a slight and unimportant difference as to the precise ground upon which their conclusions are founded, very clearly there is a concurrence of opinion that where there is a contest and fair subject of controversy as to the facts of freedom, the writ of *habeas corpus* is not the appropriate remedy and is unsuitable to such purpose. That there is nothing in our laws to relieve the case from the operation of the ruling, as here announced, will readily appear from a simple recitation of the different statutes of our Legisla-

ture passed in reference to this class of persons. It is not permitted them to keep or use fire arms, or buy them or powder, lead or shot, nor even spirituous liquors, without the consent of guardian—nor to intermarry with white male persons. Their immigration to this State is prohibited, with directions to Justices of the Peace to transport them beyond the State. They are not to use abusive and provoking language to or lift their hands in opposition to any person not a negro or mulatto. They are not allowed to be witnesses, except as to slaves, free negroes or mulattoes. In case of an execution against them, without payment in five days, they are liable to be sold as a slave. By a law passed in 1848, all free negroes and mulattoes above the age of 12 years are required to have a guardian, "who shall have power to sue for and recover all such sums of money as are or hereafter may be owing to such free negro or mulatto, and shall have the same control over such free negroes or mulattoes as is possessed by guardians in other cases."—Page 27.

These provisions of our State legislation but confirm and justify the views contained in the decisions quoted and conclusions to which we have arrived, that the present being a case of actual and real controversy as to the right of freedom on the part of the petitioner, he is not entitled to be discharged by writ of *habeas corpus*, and that the Circuit Court erred in granting his discharge. Nor does the fact that the application was made through another, a citizen of the State, in our opinion, change this view of the subject. The appointment of guardian neither gives nor creates greater rights than without it; certainly can have no effect of depriving the person claiming as owner of the right of trial by jury, secured by the highest of all sanctions. The appointment is but the means of attaining known or fixed rights, not of conferring new and impor-

tant ones. The petition does not purport even to be by a guardian. Nor have we considered it appropriate, on the present occasion, to express our opinion as to the proper remedy to be adopted by the petitioner in further pursuance of his rights. The action of appellate Courts, for the most part, with few exceptions, is confined to questions raised by the records. The case presented by this record is as to the contested question of freedom in favor of a man of color based upon an application for a writ of *habeas corpus*. We have determined this to be erroneous, and it is sufficient to say, that, in our opinion, our duty is fully discharged. Other questions, that will arise hereafter, will be discussed and considered when the case may be presented in a legal and appropriate shape.

The judgment of the Circuit Court will be reversed and set aside and the cause remanded, with instructions to that Court to dismiss the writ and petition with costs.